May it please the Court, Joan Jacobs-Levy appearing on behalf of the Appellant Defendant Daniel Boobar, I'd like to reserve four minutes for rebuttal. This case has several interesting issues, and the one that I'd like to start off by addressing has to deal with the impact of the lack of the First Amendment jury instruction. This case kind of deals with the tension between lawful thoughts, lawful expression, lawful, though maybe distasteful, fiction, versus child pornography, and deals with when – how does a jury know when the line is crossed? How do we know when we move from lawful activity into unlawful activity? Do we review that – can we review that at all, or do we review it for plain error? Well, the Court can review – well, what I wanted to bring to the Court's attention is that, and this was not brought out in the brief, but on review, Mr. Boobar's attorney actually requested a jury instruction in his motion in limine. This would be record – excerpt of record 13. Yes, and the Court said that'd be – that sounded like a good idea. And when it came, though, to the Court telling what the instructions were and asking for any objections, et cetera, counsel did not object to the – let's say the omission of that instruction. Is that correct? That is correct. Counsel well knew that that was a possible instruction and didn't say anything about it. Is that an actual waiver so that we can't even review it at all? Because they knew their rights, they were well aware of the fact they could have it, and they simply didn't raise any comment about it. Well – Is that a waiver or is it just a forfeiture? It – it – the Court may review it for plain error. When a defendant fails to object a trial to the lack of a jury instruction, this Court may review it for plain error. Well, that's not necessarily true. It's – it's true unless it's a waiver. If it's a waiver, that is a – an actual yielding up of a known right, then we don't review it at all. It's just plain waived. If it's a forfeiture where they just don't raise their objection, because maybe they didn't understand their right or whatever the thing is, then we review it for plain error. And that's what I'm asking you. Is this really a waiver or is it a forfeiture? It's – under your definition, I would have to consider this a forfeiture because thematically throughout, both by the judge and by – by counsel, the issue of the First Amendment would come up and then get sidetracked and never come to fruition. But – We're talking about instructions, though. Right. The time of instruction, the Court, let's say, forgets it, doesn't put it in, and he says instructions are fine with me, Judge, even though he well knows what he's saying. Well, the judge has a sua sponte duty, obligation, to provide a First Amendment jury instruction to protect the constitutional rights, and this is from U.S. v. Bayer. We're talking about waiver, though. Counsel's well aware of it. The defense is well aware of it and simply doesn't raise it. In my opinion and from my research, I do not see this as a waiver of a right. I see this as something that is reviewable on a plain error standard. Okay. So we're plain error review at best, right? That's correct, Your Honor. Okay. And in this case, it's our belief that this does affect substantial rights, that it is a clear and obvious error because of the fact that the First Amendment was obviously on the minds of both the judge and defense attorney, and that in, you know, I would have to say, not having been the trial attorney, but from the review, it was a very contentious and very long-drawn-out affair, and I think just in the heat of the moment of getting that trial underway, it honestly was forgotten. And the judge himself had said that he wanted to instruct and didn't. So I really feel it was more of a negligent error than a waiver. Under plain error, it's got to be error, it's got to be plain, it's got to be prejudicial, and it's got to be such that it offends our sense of ordered justice. All right. What would you have had the judge, I guess, sui sponte, instruct? Do you have a text that you would do you think that is obligated? But the judge himself said at the motions and limine hearing that the jury really needs to be educated. You know, the discussion was these salacious stories, the chat logs, you know, all of this information that the jury was going to receive, which is very – has a very emotional impact, very prejudicial, and that they needed to be instructed on, though it may be distasteful and not found in their home, that this is lawful material. Rather than tell me what the scene was, tell me what you think now. The law requires the judge to have instructed. What text are you proposing the judge should have instructed? Are you asking for a proposed instruction? Yes. I mean, if you're saying that he should have instructed, right, what should he have instructed? That he should have instructed that – I'm taking it down. Exactly. What should he have instructed? Well, I can't give you – You haven't talked to the law. Without having model jury instructions, but I can tell you what the – what I believe the context should be. Thank you very much. You've answered my question. You don't have an instruction in mind. No, Your Honor, I don't. Thank you. Now, the defense essentially was, if I understand it roughly, the defense was, well, this is Mr. Boubar's – is it Boubar or – Boubar, yes. Mr. Boubar's language in the chat logs, et cetera, all of this is simply fantasy. He simply was using words, and it's simply fantasy, and he never – he never intended to cause any child pornography, and he never intended to, or he would say, actually got any pornography as such, right? That's his defense. Correct. Okay. If the jury believed that defense, whether he had a First Amendment right to say whatever he wanted, is a little remote, isn't it? I mean, how does not telling the jury, well, you know, people can say whatever they want. It's all right to say whatever you want. Nothing wrong with writing these stories and transmitting them to other people. That's just okay. But if the jury believes in the first place there's nothing to it at all, it's just all fantasy, then he wins anyway, right? And if the jury doesn't believe that, if the jury believes, you know, this guy was doing these things, his chat logs, his sending of stories, et cetera, he was doing all this because he was trying to generate child pornography. That's what he was doing. If they believe that, he loses. If they believe his story, he wins, without the First Amendment, wouldn't he? Well, I don't think that's necessarily the case, because I think it's possible that the jury could have punished him or found him guilty based only on the lawful part of it. We don't know. It was a general verdict for him. So we don't know whether it was that they believed the government's computer evidence, they believed Mr. Harlan's testimony. We don't know what specifically they found. They were never told that you can find him guilty on that basis, were they? They were instructed on what the law defined him guilty was, were they not? Yes. Yes. And they weren't told, oh, well, if he's just talking nasty or sending some nasty written material, he can be convicted. They weren't told that, were they? No. No. But they weren't told that he couldn't be convicted just for that either. Well, sure. And they weren't told he couldn't be convicted for speeding on the freeway either, but, hey. But where a jury delivers a guilty verdict and that verdict could have rested on different theories, and one of those theories was constitutionally invalid, for example, like a First Amendment issue, I would posit that it then becomes a structural error, and it would cause the conviction to have to be set aside, because if there's – if this has to do with a person being punished because of their First Amendment rights of expression, rather than the actual participation in the exploitation of children, I think that taints the whole jury process. What's your best case for – that the U.S. Supreme Court would tag omitting an instruction like this as structural error? Now, they've done that with beyond a reasonable doubt, maybe. They've done that if you don't have an attorney. I think I've almost – I think I've almost eliminated the universe of times they find structural error. Well, make – what's the best case that they would find this to be structural error? I'm not going to outguess the Supreme Court, Your Honor. Okay. I can just make my argument to you that, to me, the first – that First Amendment issue just permeates this whole case because the evidence – because basically we're at an impasse. There were experts on both sides in dealing with the forensic computer evidence, and to me, it looked like that canceled each other out, it neutralized it. So there was the credibility issues of the main – the two witnesses. Your four minutes is coming up for rebuttal. Do you want to keep that time? Well, I wanted to also move on very briefly, if I could, because it kind of tag-tails with the First Amendment issue is the cumulativeness and the prejudice of the – of the evidence itself. You know, the large quantities of the salacious evidence that was brought in, and the fact that this judge never reviewed in camera prior to the trial any of the alleged pornographic pictures, any of the stories, any – any of the chat logs. And he admitted that that was on the record. He had not reviewed it. And furthermore, there was no air of no – Was there a proffer of the evidence to the judge in a motion in Liminey before the trial? Yes, there was. Yes, there was. And he said he wouldn't look at it? He didn't say he wouldn't look at it. He just said he didn't. In the motion in Liminey. In the motion in Liminey, there was a request – and in prior discovery motions as well, there was a request for in-camera review. And the judge didn't. And – There was no objection at trial, correct? Yes, there was. At trial, when that – when that evidence was admitted, when there was a move in evidence? Well, what there was is it wasn't a motion to exclude all the evidence, but it was a motion to limit, to limit the quantity, and it was – In the motion in Liminey. And also an oral argument on that. In the motion in Liminey. That's what I mean. Yes. Okay. Oh, at the motion in Liminey here. Yes. And the judge said, in effect, talk to me later. But you guys try to work this out. Why don't you guys try to limit the amount that's coming in? And when it's raised, when you come back to me, talk to me at some other time. Talk to me at trial, for example. My understanding of motions in Liminey is that they have no binding effect unless the judge makes it perfectly clear he will not consider the matter again. And this judge didn't do that, did he? No, he didn't. So it's plain error review at best, right? Your Honor, I would just like – I'm down to less than two minutes. You said you wanted to keep talking. I know. I'd love to keep going. I've got so much to say. But I think it's best for the government to go. Thank you. Good morning, Your Honors. David Gappa for the United States. Two points quickly in response to the arguments presented by counsel this morning. And first, to answer the Court's question to counsel, the government's view is that there was a waiver by the defense on the jury instruction issue. We outlined that in our brief at pages 51 and 52 and cited the relevant Ninth Circuit cases, specifically Perez, Griffin, and Stouffer, among others. We believe that the defendant was on notice about the potential First Amendment issue. It was raised by the judge, and he said that we might give some pre-instruction on that. That was at the motion in limine conference. However, at the conclusion of that motion in limine conference, it appears that the defense changed. While initially they were going to contest everything, it appears that the defense changed from, we're not going to contest the identity of Laltot. We'll concede he is Laltot. Rather, our defense now is going to be, he didn't have any interest in this material, and this was all fantasy. And that may have had some impact. We don't know. It would be speculation on anyone's part why the defense didn't pursue the First Amendment instruction. But clearly, as this Court has already noted, he was on notice that that would be an issue. It was raised by the Court. The defendant had an opportunity to present an instruction. He didn't do that. He accepted the instructions. Therefore, in our view, it's a waiver. And this Court should not review it. Going to the issue. Mr. Galpert. Just, counsel, I have a question as Judge Gould. Let's just assume for a minute it's not a waiver, and that we're under the traditional plain-air test. So what would be the government's position first on the issue of whether substantial rights are affected, and second, on the issue of whether, you know, fairness, integrity, reputation of the Court would be compromised if we didn't give relief? And I know it's kind of hard without a specific instruction in mind, but I'd like to hear the government's view on those two issues. Thank you, Your Honor. And to answer them, I would refer back to Judge Fernandez's question and observation that the jury was presented with a defense that this was all fantasy. And whether or not the jury was instructed that an individual has a First Amendment right to engage in fantasy or not, even if that's the law and if they're instructed on that, they can still decide that based on the evidence and the facts that were and went into criminal activity, and that even his words alone were sufficient to promote and encourage and incite the production of those images of child pornography as well as their distribution. So we don't believe that his substantial rights were in fact affected to the extent that there would be any perception that this was not a fair trial. Also, given the fact that he was put on notice that if he wanted to present a First Amendment instruction, he had the opportunity to do that. Mr. Galpin, you said a jury could decide that this was not fantasy, that this was an attempt to procure child pornography. But the test under Olano is not whether the jury could find it was not fantasy. That would be a Jackson versus Virginia test of sufficiency of the evidence. The test, as I understand it, is, is there sufficient evidence that a reasonable jury is engaging in child pornography procurement rather than fantasy? Isn't that the proper test? To clarify and make sure I understand so I can answer the court's question, is this on the First Amendment instruction issue? Yes. Well, obviously, as we've said, we believe there's a waiver, but assuming that there's a forfeiture in plain air, correct. I'm following Judge Gould's suggestion that you address the question not as waiver, but as forfeiture. Correct. The test is not whether there is sufficient evidence for a jury to be able to find that the prosecution is correct. The question is whether the lack of the instruction wouldn't have made any difference because the evidence was such that it would be likely that the jury would find that the prosecution was correct. Isn't that correct? Yes. Wouldn't you change the word could for would? Yes. And we believe that, as I believe has been noted in our brief, that the evidence, in our view, was overwhelming. And given the length of the trial and the relatively brief deliberation, I think a fair reference is that the jury may have agreed with the government that the evidence was overwhelming. Going to the second issue raised this morning by counsel about the quantity of the material, I'm glad that the Court was at least presented with the opportunity to see, and I'm always sympathetic to any time any court, anybody has to be subjected to that material, but I think that if the Court does look at that, as I had to recently in reviewing for this argument, it's questionable whether there were actually 52 images of child pornography. We don't believe that there were. There were perhaps 52 images in those DB1 and DB16 series. Not all of those, however, would meet the definition of a minor engaged in sexually explicit conduct. We believe that if you go through that, it's closer to approximately 36 images. However, I think an important point on this is, again, to go back to the motion in Lemonet hearing, after the Court had given its tentative ruling saying that I'm not going to necessarily at this point in time, pretrial, make a decision and limit the government, I'm going to need to see where we are at trial, what the defense is, and where we are in context to make that final decision. Well, in between a final decision at trial being made on the admissibility and that tentative pronouncement on the motion in Lemonet hearing, as I noted, the defense seemed to change. And in fact, they said, now we're not contesting the identity of the defendant. We're just going to say that he's not interested in this material. Then he took it a step further in his opening statement to the jury. The defense counsel got up, and he specifically said, even though the government had made a vague reference in deference to the Court's ruling, not mentioning the specific numbers, but the defense counsel specifically threw out the numbers of specific types of evidence that the jurors would see, he referenced 150 stories and 500 pages, and then he specifically said, I invite you to read each and every one of those. This is his thing. This is what he was into, but this was legal material. He also talked about two packets of images, and he said there will be about 50 images of child porn. So he himself said, you will see 50 images of child pornography in this case. And he said, that's just not any material that he was interested in. So we think that that negates any type of a prejudicial impact on this. I think it's also important to note that the defense counsel had to spin it somehow, and he couldn't deny its existence. Well, that's correct. However, these are comments he made in opening statement, and he specifically said those things before the jury was presented any evidence. And it wasn't necessarily coming in at that point, was it? That's correct. However, it seemed to the government at that point that he has now changed his tactic in the defense, and he's no longer. One thing that's slightly puzzling to me, and I might have missed it in the record, at the end of that motion-eliminated hearing, the judge said a few, or during, he said a couple of things. He said, why don't you guys get together and try to work out how much is going to be submitted and how much is going to be left out? And it didn't look like it was all submitted, but that's either here or there. And then at the very end, he said, and the government, why don't you guys prepare an order memorializing what we decided here today? Did it? Yes, the court did do that. I know the court did that. Did the government prepare such an order? I don't know that there's an order in the record. I didn't find one, and that's why I'm asking. That's correct. The government said, we, the court said, would you do it? And the government said, sure, no problem. That's correct. And to the extent that that is any defect, I will take personal responsibility for that. I think what happened is that given the nature of the timing of that trial and the conference coming on the eve of the trial, there's reference also to working on Saturday and over the weekend. And there was exchange of information, and we did specifically give, and I believe there's reference in the record, to the specific images that were proposed as exhibits, the DB-1 and the DB-16 photographs. I'm not asking you to apologize. I just wanted to know if I missed it. No. Okay. So it's not in there. All right. Go ahead. Your Honor, on the issue of the alleged Brady violation, we've briefed that fully. We don't believe that there was a Brady violation. The defense makes much of alleged withholding of evidence. I think it's very important to note here, and if you pay careful attention to the record, which I'm sure will be done, there are some exhibits here in the excerpts of record that I would direct the Court's specific attention to, specifically in the defense excerpts at tab 23, there is the booking sheet for the tape of the interview, which is at issue. And you'll note there that that tape was booked into evidence on March 12th of 2002, and it didn't leave evidence until October 17th of 2005. The purpose of that evidence being taken out at that time was to provide a copy of the And in his declaration, which is also in the excerpts of record under tab 23, he has stated that he specifically made requests pretrial to his colleagues at the ICE office in Florida and also after trial, and also Detective Cassada with the Clovis Police Department had specifically, in connection with different aspects of the case and the investigation of it, met with representatives from the Palm Beach County, Florida, Sheriff's Office, as well as ICE agents in Florida. Nobody had known that this tape existed before the trial. Well, that takes care of bad faith, right? If you're right, if that's accepted, it takes care of bad faith. Doesn't necessarily take care of Brady as such, does it? Well, we If the trial court found that it did, well, you guys were in a joint investigation, so whether you had it or not is irrelevant. I would say it was potential Brady evidence. However, the court found, first, that there was an instant miscommunication on the behalf of the Palm Beach County Sheriff's Office. But in the court's analysis, which was quite thorough in the decision on the new trial motion, they said that it was not material in that, given the volume of other evidence, that it was not likely that this would produce any different result. In addition, specifically, that tape was not considered anything other than potentially impeachment material. And that is, if you give it the most favorable interpretation, if you read the transcript, you'll see, and this is another important note, that there was a collaborative interview by state, federal, local officers and investigators prior to this interview, which was done solely by Detective Linda Heber. So, in other words, everybody else who was working on this case interviewed Mr. Harland, and that was documented in various reports. Those reports were all turned over to the defense pre-trial. One of those reports is a custom service report, and that recorded Mr. Harland's statement that he had not only taken these images of his daughter, but also had sent them to four to five people on the internet. So, to the extent that later, Detective Hebert, on her own, takes a statement from, and is recording that statement, that says, who did you send these to? And he says, some guy out in California. Well, what was his name? Lloyd. Anybody else? Well, some other guy, Paul. And she doesn't follow up to say, well, was there a third person? Was there a fourth person? It doesn't mean that he only sent it to two people as the defense is now spinning it. When previously even, and this is what they had before the trial, he had sent four or five different people these images. So, we don't even see that as impeachment evidence. But even to the extent that it was, it was merely cumulative impeachment evidence, and not probable that there would be a different result if it were available for use at trial. And even if it were considered a Brady violation, we don't believe that there's the test that has been met for the new trial motion, which would take five different elements. And the district court, I believe, was correct that there was no proof of satisfying each of those five elements. Finally, on the sentencing issue, it hasn't been raised in argument today. However, in our brief, we outlined that we don't believe that there was any error. I think it's important to note that there was a basis for the court to find the obstruction of justice, and that two-level enhancement should be applied. The court said basically he would be negligent if he ignored the law on the issue. Given both that, you could reasonably infer that the defendant had perjured himself in testimony, but more significant to the sentencing judge was that there was actual physical destruction of evidence, which was proven through the wiping of Defendant Mubar's computer. Once he knew that his friends had been indicted, and that there would, as his worst fear was, be found to have been connected to those people, he wiped his computer, and that was proven at trial. We believe that that qualifies as a two-level enhancement for obstruction. And also on the number of victims, very briefly, it's important to note in the record that defense counsel made an argument, brought it to the court's attention. He thought there was an error. The judge said, well, even if I accepted your calculation based on the totality of circumstances, the 3553A factors, 188 months is what I would think is reasonable in this. Thank you. Thank you very much. Ms. Levy. As far as Special Agent Prado receiving the tape on October 17th, 05, first of all, that is true, we are aware of it. However, on receipt of it, it still wasn't turned over to the defense, and it didn't get turned over to the defense until April of 2006. But maybe even more importantly than that, the defense investigator, Mr. Chavon, had contacted the defense, got the subpoenas signed by the judge, and went down and actually to Florida and contacted the West Palm Beach Sheriff's Office, the District Attorney's Office, and I believe even the public defender, Federal public defender because Mr. Harlan was prosecuted twice in Florida, in the State court and in the Federal system. And Mr. Chavon was told, they were told that nobody had asked for this material, and had they asked, it would have been turned over. And they were very forthcoming, and in the record there is a property receipt, which was referred to by Mr. Gapa, and attached to that is the fax cover sheet. From the person who sent it out, and they were very cooperative, and it just seems that the information could have gotten there much more quickly. And even Special Agent Prado himself was able to get information within three days. This was in April 2006. He said that every report that was filed in, by ICE, Immigration Customs Enforcement, is electronic. And so all you need to do is key in a query, and up comes the report. And he got a whole bunch of reports to the defense, I think it was just before sentencing, within three days of the request. Quickly, on the Hebert, the tape with Harland, in terms of whether there was follow-up. He said it was Paul and Lloyd, and then she said, does anyone else know about this? And he said no, and she said, just Paul and Lloyd, yes, Paul and Lloyd. So there was a follow-up on that. You're over your time. Thank you very much, Lee. Thank you. The case will be submitted. Counsel, thank you for an excellent argument. Carlos, do you think we could take a 10-minute break now? We certainly can, thank you. I was just about to say that.
judges: Fernandez, Gould, Bea